## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FELIX J. ESQUIBEL,               )
                                 )
            Plaintiff,           )
                                 )
      v.                         )      Civil Action No.06-1485 (PLF)
                                 )
MARIA CINO,                      )
                                 )
            Defendant.           )
_____)

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

Plaintiff Felix J. Esquibel, by and through undersigned counsel, hereby files his Opposition to Defendant's Motion for Summary Judgment and his Cross Motion for Summary Judgment, and in support thereof, states as follows:

### INTRODUCTION

Plaintiff Felix J. Esquibel is a quality management expert with over fifteen years of experience in the field of quality management systems.  The Agency discriminated against Mr. Esquibel on the basis of his race and national origin (Hispanic) when it failed to select him for a position as a Quality Management Systems and Standards Specialist.  Mr. Esquibel applied for and was eminently qualified for the position. Despite his demonstrably superior qualifications, the Agency selected Michael Lightbown, a White male, for the position.

## SUMMARY OF THE ISSUES

The Agency has filed a Motion for Summary Judgment, alleging that Mr. Esquibel has failed to provide sufficient evidence that he was qualified for the position and, therefore, has failed to establish a case of discrimination. Plaintiff submits the instant Memorandum to demonstrate that he has satisfied his burden by establishing that (1) he was more for the position than the selectee, and (2) the Agency's proffered reason is pretext for discrimination.

Therefore, Plaintiff will demonstrate that based on the evidence in the record, he is entitled to the following:

1.  Affirmative judgment as a matter of law, and

2.  Denial of Defendant's Motion for Summary Judgment.

## FACTUAL BACKGROUND

1.  Mr. Esquibel is a highly experienced manager for the Federal Aviation Administration ("FAA"). Mr. Esquibel graduated <u>cum</u> <u>laude</u> from Embry-Riddle Aeronautical University with a Bachelor of Science in Professional Aeronautics. <u>See</u> Resume of Felix J. Esquibel, attached hereto as Exhibit 1; <u>see</u> <u>also</u> Esquibel Dep., p. 22, attached hereto as Exhibit 2.

2.  Mr. Esquibel also holds a Masters degree in Business Administration ("MBA") with a special emphasis in Organizational

2

Development.  Id.

3.  Mr. Esquibel has 27 years of aviation related experience, which includes 18 years with the DOT/FAA.  Mr. Esquibel started working at the DOT/FAA as a GS-11 Air Traffic Controller in 1988, after serving in the United States Air Force since 1979.  He was responsible for the safe, efficient and smooth flow of air traffic at Chicago-Dupage Air Traffic Control Tower, a Level II, Visual Flight Rules ("VFR") airport serving the Chicago Metropolitan area.  Mr. Esquibel earned a competitive promotion to a temporary supervisory position and was formally recognized with a Letter of Commendation by the Air Traffic Manager for his service.

4.  Mr. Esquibel was subsequently promoted to serve as an Air Traffic Control Specialist at Chicago-Midway Air Traffic Control Tower.  Mr. Esquibel served the DOT/FAA as an EEO counselor for the Chicago Metropolitan Area, a collateral duty in which he received extensive training in EEO law.  Mr. Esquibel played an instrumental role in resolving numerous informal complaints.

5.  Mr. Esquibel was promoted to his present position of Operations Supervisor from the position of Air Traffic Controller, GS-12 in 1995.  In his current position Mr. Esquibel

is responsible for the daily operation of Instrument Flight Rules ("IFR") and VFR air traffic activities within Kalamazoo's delegated airspace.

6.   Mr. Esquibel took this opportunity to introduce quality management concepts into Kalamazoo's air traffic control division, where no quality management system had yet been used. Esquibel Dep., p. 20. Over the past thirteen years, Plaintiff has conducted hundreds of investigations to ensure strict adherance to quality control standards.  Esquibel Dep., p. 20.

7.   Mr. Esquibel has achieved many job-related performance awards, including letters of commendation and exemplary appraisals of performance from the Federal Aviation Administration.   Moreover, Mr. Esquibel has earned Organizational Success Increases and Superior Contribution Increases to his salary as an FAA employee.

8.   In addition to his success in the field of aviation, Mr. Esquibel is also a professional in the field of ISO 9000 quality management standards.  Exh. 1.  Mr. Esquibel has extensive business knowledge in the areas of management, quality control, ISO 9000, the Malcolm Baldrige National Quality Award, and all phases of project management.  Mr. Esquibel is a member

of the Project Management Institute ("PMI"), as well as a Senior Member of the American Society of Quality.  Exh. 1.

9.   Mr. Esquibel holds numerous certifications in the field of quality management systems.  Mr. Esquibel was certified by IRCA as a Certified Auditor/Lead Auditor of Quality Systems in the year 2001.  Mr. Esquibel was certified by the American Society of Quality ("ASQ") as a Certified Quality Technician in the year 1999 and as a Certified Quality Manager in the year 2000.

10.  During Mr. Esquibel's eight years of active-duty with the U.S. Air Force and 10 years of experience with the U.S. Air Force Reserve ("USAFR"), he was competitively selected to facilitate Leadership Development Programs for the Fourth Air Force.  This work included quality initiatives as outlined by renowned quality experts Crosby, Deming, and Juran.  Exh. 1.

11.  Mr. Esquibel became an adjunct professor at Davenport University in the year 1998.  Exh. 1; Esquibel Dep., p. 23. Davenport University hired Plaintiff to teach a course on "the management and control of quality" based on his extensive educational and professional background in the field of quality management.  Esquibel Dep., pp. 23-24.

12.  Davenport University soon recognized Mr. Esquibel's knowledge and skill in training and teaching quality management concepts and requested that he teach more courses.  Over the past ten years, Mr. Esquibel has taught over 60 courses in the area of production and quality assurance, leadership, business standards and creativity and innovation.  Esquibel Dep., p. 23.

13.  Mr. Esquibel has also been recognized and retained as a subject-matter expert in the field of ISO 9000 quality management systems by the John Henry Corporation.  Esquibel Dep., p. 29.  Mr. Esquibel served as an expert to facilitate the corporation's transition to an ISO 9000 system and to aid the corporation in attaining ISO 9000 registration.  Id.

### Non-Selection

14.  Mr. Esquibel was subjected to a non-selection on the basis of his race and national origin (Hispanic) for the position advertised in FAA Vacancy Announcement Number AWA-AIR-04-AT40010-72564, Quality Management System & Standards Specialist.  See Vacancy Announcement, attached hereto as Exhibit 3.  The vacancy was located in Washington, D.C.

15.  The official who made the selection was Juanita Young, former Manager of Quality Assurance Specialists in the AIR-220

Division of the Federal Aviation Administration.  <u>See</u> Young Dep., p. 4, attached hereto as Exhibit 4.

16.  Mr. Esquibel submitted his application for the position on March 17, 2004.  <u>See</u> Esquibel Application, attached hereto as Exhibit 5.  Included with his application was his full resume and four additional pages of information addressing the vacancy-specific knowledge, skills, abilities, and other characteristics ("KSAOs").[1]

17.  Mr. Esquibel was never contacted for an interview for this position.  Esquibel Dep., p. 39.

18.  On December 2, 2004, Mr. Esquibel contacted the Agency to inquire about the status of his application.  Mr. Esquibel was informed that the Agency had selected another applicant in June 2004.  Esquibel Dep., p. 40.

19.  On December 16, 2004, Mr. Esquibel made a formal request to the Agency for a "debrief" — a common feedback mechanism — for the purpose of finding out how he could improve his resume for future vacancies.  The Agency refused to debrief

---

[1]Defendant identifies the questions on its vacancy announcement as "KSAOs", which equate to the government-wide questions identified as "KSAs".  Both Plaintiff and Defendant use the terms "KSAO" and "KSA" interchangeably in this action.

Mr. Esquibel and gave no reason for the refusal. Esquibel Dep., pp. 40-41.

20. Mr. Esquibel filed his formal EEO Complaint on January 9, 2005. Esquibel Dep., 43. Mr. Esquibel had an excellent record, a quarter century of relevant experience and outstanding performance appraisals. Although he applied for the position in a timely manner, the DOT/FAA has stonewalled every request for resolution to his claim of disparate treatment. Esquibel Dep., p. 42.

21. The selectee for the vacancy was Mr. Michael J. Lightbown (non-Hispanic). The selectee's credentials are significantly less than those of Mr. Esquibel. See Lightbown Application, attached hereto as Exhibit 6. Mr. Esquibel's qualifications were demonstrably superior to those of the selectee.

22. Technical expertise in and implementation of ISO 9000 quality standards is a core responsibility of the vacancy. See Exh. 3. Mr. Esquibel has taught a number of courses at Davenport University focusing heavily on precisely these quality standards. See Exh. 1. He holds an MBA, as well as being certified as a Quality Control Technician and Quality Manager. Id.

8

23.  According to Technical Committee 176, the United States representative to the International Organization of Standards, ISO 9000 is a "business" standard, not a "technical" standard. ISO 9000 does not specify how to make a better airplane — it specifies those actions management must take to ensure all the technical specifications are incorporated into the business processes to ensure quality is delivered to the customer.

24.  Mr. Esquibel has the technical background coupled with the business background needed for the position.

25.  By contrast, the selectee only has an Associate's degree in Aeronautical Science.  See Exh. 6.  The selectee is not certified as a Quality Technician or Quality Manager by the American Society of Quality — the society that oversees the ISO 9000 Program in the United States.  Id.  Mr. Esquibel is.  See Exh. 1.

26.  Training and providing guidance to DOT/FAA personnel service-wide regarding quality management issues are core responsibilities of the position at issue.  See Exh. 3.  Mr. Esquibel has had over fifteen years of teaching and training students and managers in quality management issues.  The selectee, however, has provided only limited training on ISO

issues during his service as a business consultant.  <u>See</u> Exh. 6, p. 25.

27.  Mr. Esquibel has worked as a consultant for local private industry as a facilitator for Economic Development Job Training Grants, working toward ISO 9000 certification.  <u>See</u> Exh. 1.  Mr. Esquibel's work involved problem-solving and process improvement.  <u>Id</u>.  This experience is directly related to the advertised position's requirement that a successful candidate must have "comprehensive knowledge of problem-solving techniques for evaluating or improving processes and programs." <u>See</u> Exh. 3.  The selectee's application cited limited knowledge of problem-solving that could only be applied to "event-based problems".  <u>See</u> Exh. 6.

28.  Actively promoting cooperation, teamwork, attaining objectives, making decisions, and exercising initiative on highly visible programs are all core responsibilities of the vacancy.  <u>See</u> Exh. 3.  Mr. Esquibel has demonstrated the ability to perform all of these duties over his 25 years as a public servant in the Air Force and DOT/FAA.

29.  Mr. Esquibel has been employed by the FAA continuously since 1988, giving him 18 years of service as an employee of the

Agency.  <u>See</u> Exh. 1.  The selectee has only been employed by the FAA since 1991.  <u>See</u> Exh. 6.

30.  Based on the large disparity between the qualifications of Mr. Esquibel and the selectee, the selectee's hire cannot be justified.

31.  Mr. Esquibel repeatedly requested the reasons to support this selection, yet no rationale was provided to him until he filed the instant action.  Esquibel Dep., 42.

32.  During depositions in the instant action, Defendant articulated for the first time a rationale for its selection. <u>See</u> Exh. 4.  Agency officials claimed that Mr. Lightbown was selected because he possessed "hands-on" experience conducting audits and setting up Quality Management Systems.  Young Dep., pp. 33, 39, 41-42, 53, 57-58.

33.  Defendant also admitted, however, that it hired contractors to actually perform the audits and set up the Quality Management System.  Young Dep., p. 72.

34.  Mr. Esquibel's non-selection is the result of a systematic and chronic under-representation of Hispanics at higher levels of the DOT/FAA. This under-representation of Hispanics is not a result of a lack of highly-qualified Hispanic candidates with requisite job experience and education.

11

35.  According to FAA statistics, while Hispanic employees constitute 18% of FAA employees in GS-1 to GS-4 positions, they do not constitute more than 7.5% of FAA employees in any higher pay grade, dropping to a mere 4.5% of FAA SES employees.

36.  No other minority group displays a distribution of relative percentages of employees within FAA at each level that is so dramatically skewed towards the lowest pay categories. This under representation was addressed in Executive Order 13171 noting "that Hispanics are under represented in the Federal civilian workforce."

37.  These trends are a reflection of a government-wide Hispanic representation crisis.  In FY 2005 Hispanics comprised 13.5% of the civilian labor force while comprising only 7.4% of the federal workforce.  Hispanics are the only minority group under-represented in the federal workforce; overall representation of minorities in the federal workforce is actually higher than the proportion of minorities in the civilian labor force by 4.4%.

38.  The gap between the proportion of Hispanics in the federal workforce and the civilian labor force has grown by 30% since 2000.

39. The proportional rate of hiring of Hispanics by the federal government is decreasing.  In 2002, Hispanics were 9.5% of federal new hires; in FY 2005, they were only 8.3% of federal new hires.

40. The retention rates for Hispanics in federal service are appallingly low.  The number of separations of Hispanic employees since 2001 has been roughly 45% as much as the number of new Hispanic hires during the same period.

41. Hispanics are grossly under-represented in senior executive positions.  Hispanic representation at the Senior Pay Level has increased at a rate of only one tenth of one percent a year since 2000, from 3% to 3.5%.  Hispanic career SES representation has actually decreased, from 2.5% in 2000 to 2.3 percent in FY 2005.

42. The problem will only get worse.  Given the GAO's projections for the retirement rate of senior executives, by 2007, the current rate of hiring of Hispanics will be insufficient to keep up with the rate of retirement.  If current trends continue, the number of Hispanics in career SES positions will decline to less than 140 government-wide.

43. The Agency's lackadaisical implementation of Special Emphasis Programs, Executive Orders, laws and regulations

13

guarantees that the proportion of Hispanic employees in Agency will continue to remain skewed.

### ARGUMENTS

### I.  Legal Standards For Summary Judgment

Summary judgment is appropriately granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2458 (1986); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine what facts are "material," the Court must look to the substantive law on which each count or claim rests. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986).  A "genuine issue" exists if the resolution of that issue could "establish an element of a claim or defense and, therefore affect the outcome of the action.  Carter v. George Washington Univ., 180 F. Supp. 2d 97, 102 (D.D.C. 2001) (citing Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 248).

In the case at bar, Plaintiff and Defendant agree that the material facts are not in dispute.  See Def. Mot., p. 5. Plaintiff has worked in the field of quality management systems for over fifteen years as a management consultant to a private company's transition to the ISO 9001:1994 system, a professor at

14

the Davenport University teaching courses in ISO 9000 management
and ISO 9000 quality systems, and facilitating the 4th Air Force
transition to its first quality management system. <u>See</u> Exh. 1.
Plaintiff has been certified by the American Society of Quality
a Quality Management Specialist and Quality Technician. <u>See</u>
Exh. 5. Plaintiff has been an Agency employee for twenty years,
from 1998 through the present. <u>See</u> Exh. 1.

The selectee has experience in the FAA ACSEP quality
management system — a separate and distinct system from ISO
9000. <u>See</u> Exh. 6 at KSA 1. The selectee has provided some
consulting services to organizations making the transition to a
QMS "based on" ISO 9001:2000 standard, but not to organizations
making the transition to ISO 9000. <u>See</u> Exh. 6 at KSA 2. The
selectee possessed a certification from the American Society of
Quality as a Quality Auditor, but not as a Quality Management
Specialist. <u>See</u> Exh. 6 at KSA 1.

Defendant's stated reason for hiring the selectee over
Plaintiff was that the selectee possessed "hands-on" experience
starting up a QMS system and conducting audits. Young Dep., pp.
33, 39, 41-42, 53, 57-58. Defendant stated that the skills were
necessary because the incumbent's primary duties would involve
starting the QMS system and conducting audits. Young Dep., pp.

15

57-58. However, three months after the selectee took the position, Defendant hired a contractor to perform the QMS startup and the resulting audits. Young Dep., p. 72.

Once the employer has articulated a legitimate reason for the selection, proof of Plaintiff's prima facie case is no longer relevant. To prove entitlement to judgment as a matter of law, Plaintiff must prove only that the employer's asserted reason was false and that the employer intentionally discriminated against him.

> In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not — and should not — decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas. Rather, in considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 494 (2008) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08, 511 (1993); U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714-16 (1983).

II.  **The Court Must Grant Plaintiff's Motion for Summary Judgment Because Defendant's Articulated Reason Lacks Any Level of Credence and is Merely a Pretextual, Post Hoc Rational for Discrimination**

Plaintiff has put forth a plethora evidence in the form of testimony, documents, Agency policies and federal rules and regulations which demonstrate that Defendant's articulated reason is false and is a pretext for intentional discrimination.

A.  **Defendant's Articulated Reason is Riddled with Inconsistencies and Contradictions That Prove The Reason is False**

Defendant's stated reason for hiring the selectee, rather than Mr. Esquibel, was that the selectee possessed "hands-on" experience starting up a QMS system and conducting audits. Young Dep., pp. 33, 39, 41-42, 53, 57-58. Defendant stated that the skills were necessary because the incumbent's <u>primary</u> <u>duties</u> would be to start a QMS system and conduct audits. Young Dep., pp. 57-58.

> A: . . . [W]e went through and read the [application] packages, looking for people who had the hands-on experience in . . . detailed auditing . . .
>
> Q: Is it fair to say that hands-on auditing experience was very, very important for the position?
>
> A: . . . [Y]es.
>
> Q: . . . What kinds of detailed auditing experience were you looking for?

17

A: Actually having conducted audits, done evaluations
of quality management systems, some ISO in some cases
. . . [someone who] [h]as hands-on experience to
establish a quality management system, has experience
in developing policies and procedures, not causing
them to be done.  Hands-on experience doing it.
Hands-on experience in quality management systems,
hands-on experience in detailed auditing.  Hands-on .
. .

Q: You found that hands-on experience was more
important than the other four KSAs combined, isn't
that true?

A: Based on the timeframe we were allotted to
establish a system, which was a short timeframe . . .
Hands-on experience was very important to us because
we only had so much time to establish a quality
management system and put it in place . . .

Young Dep., pp. 16-18, 53, 77.

However, Defendant hired a contractor to perform the <u>exact</u>
<u>duties</u> it claimed were the selectee's <u>primary</u> <u>duties</u> — QMS
startup and the resulting audits — only three months after the
selectee was hired.  Young Dep., p. 72.

[T]he ultimate goal was to get the system set up.  But
they actually hired a contractor for that piece . . .
[s]o the primary goal of Mike Lightbown [sic] is
after everything is set up[,] then it has to be
maintained . . .

Young Dep., p. 72.  This fact alone is sufficient to establish
pretext.  Defendant's articulated justification is demonstrably
false because the selectee was not responsible for QMS startup
or the resulting audits <u>at</u> <u>all</u>.  <u>Aka v. Washington Hospital</u>

18

Center, 156 F.3d 1284, 1295 (D.C. Cir. 1998) ("the plaintiff can attempt to show that the employer's explanation was fabricated after the fact by showing that it contradicts other contemporaneous accounts of the employer's decision").

Moreover, Defendant's statement that the selectee's "primary goal" was to maintain the system contradicts Defendant's articulated reason for the selection (i.e., that the selectee's primary duties would be to establish the QMS and conduct the resulting audits). Defendant's contradiction evinces that Defendant's articulated reason was fabricated. United States v. Anderson, 498 F.2d 1038, 1048 (D.C. Cir. 1974) (the most logical inquiry into any witness' credibility is whether the witness had provided any other explanation previously).

Further, Defendant refused to provide Mr. Esquibel a "debrief" — a common Agency practice during which a candidate can find out why he was not selected for a position. In fact, the selecting official testified that she provided debriefs to 100 percent of the people who had requested one from her — with the exception of Mr. Esquibel. Young Dep., p. 84. Defendant's conduct smacks of discrimination in its plainest form. Defendant's conduct evinces an intention to conceal the truth

and demonstrates a strong incentive to fabricate a "legitimate non-discriminatory reason".

      B.   <u>Defendant Cannot Survive Summary Judgment Because Plaintiff Has Proven That He Is Entitled To Judgment as a Matter of Law</u>

Defendant's Opposition to Plaintiff's Motion for Summary Judgment, if any, must necessarily fail because Defendant has put forth no evidence substantiate its position, other than the self-serving statements of its own officials. "The government concedes, and the district court recognized, that bias is always relevant to witness credibility". <u>Tinker v. United States</u>, 417 F.2d 542, 544 (D.C. Cir. 1969); <u>Wynn v. United States</u>, 397 F.2d 621, 623 (D.C. Cir. 1969); <u>Villaroman v. United States</u>, 184 F.2d 261, 262 (D.C. Cir. 1950) (bias of a witness is always relevant).

Furthermore, the bias contained in Defendant's testimony is palpable. The testimony reveals that no matter how qualified Mr. Esquibel had been, Defendant would never had considered him for the position. "The partiality of a witness is . . . 'always relevant as discrediting the witness and affecting the weight of his testimony.'" <u>Davis v. Alaska</u>, 415 U.S. 308, 316 (1974) (citations omitted).

The selecting official's testimony concerning Mr. Esquibel's qualifications demonstrated a clear bias. For example, Plaintiff asked the selecting official if it was her opinion that people who manage processes did not know very much about the processes they managed. Young Dep., p. 54. The selecting official responded that "it could be". Id. Plaintiff also asked the selecting official why Defendant gave no weight to Mr. Esquibel's experience teaching ISO 9000 quality management systems. Young Dep., p. 56. The selecting official stated that a professor of quality management systems would probably possess only "a certain level" of knowledge concerning quality management systems. Id.

The selecting official's testimony reveals a plain bias against Mr. Esquibel that colored her evaluation of his skills and that is evidence of discrimination.

> [T]ellingly, [the selecting official] wrote in her summary that Aka had "no skills which will be helpful as a pharmacy technician," and that his "MBPA degree could be best utilized in other areas of the hospital." It is hard to see how an interviewer could conclude that Aka had no skills that would be helpful as a pharmacy technician; for instance, his MBPA was certainly relevant to the accounting and billing work the job entailed. This notation suggests that for some reason Breakenridge came away from her interview with Aka with a strong aversion to employing him, an aversion that colored her summary of Aka's qualifications. This aversion may have had some

21

> reasonable basis (such as Aka's asserted lack of
> enthusiasm), or it might have been rooted in bias (a
> perception that Aka was too old, or too disabled, to
> make a good employee).

Aka, 156 F.3d at 1299.  Here, too, the selecting official's unreasonable belief that (1) a manager may know little about the process he manages, and (2) a professor has only "a certain level of knowledge" about a subject-matter he has taught for over ten years, is evidence that the official's opinions were rooted in discriminatory bias.

Defendant has provided no evidence whatsoever to corroborate the biased evaluation.  Rather, Defendant summarily concludes that Mr. Esquibel's ten-year career as a professor teaching over 60 courses in quality management systems does not possess knowledge about the subject he teaches.  Defendant baldly asserts that Mr. Esquibel's experience as a manager overseeing quality control systems possesses less knowledge than someone who has simply audited existing quality management systems. Defendant's proffered evidence is severely lacking and is simply insufficient to successfully oppose a grant of summary judgment. See Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324; Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999) (the non-moving party's opposition, if any, may not rest on mere allegations or

conclusory statements, but must instead consist of competent evidence setting forth specific facts showing that a genuine issue of material fact exists for trial).

       C.    <u>Defendant's Articulated Reason Lacks Any Credence And is Merely Pretextual Because Plaintiff's Qualifications Are Demonstrably Superior To Those of the Selectee</u>

It is well-established that evidence showing an employer failed to select a candidate with superior qualifications may used to establish pretext. <u>Ash v. Tyson Foods</u>, 546 U.S. 454, 457 (2006) (evidence that the selectee was less qualified than the plaintiff may suffice, in some instances, to establish pretext); <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164, 187-188 (1989) (a plaintiff "might seek to demonstrate that respondent's claim to have promoted a better qualified applicant was pretextual by showing that she was in fact better qualified than the person chosen for the position"), superseded on other grounds by 42 U.S.C. § 1981(b); <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 259 (1981) ("The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination"); <u>Reeves v. Sanderson Plumbing</u>

Products, 530 U.S. 133, 148 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated").

Defendant does not, and indeed cannot, dispute that Plaintiff's application package demonstrates a clear knowledge of the key areas addressed in the vacancy announcement's Knowledge, Skills, Abilities and Other Characteristics ("KSAOs"). Moreover, an examination of the resumes and applications of Plaintiff and the selectee establish that Plaintiff was demonstrably more qualified for the position than the selectee — plainly showing that Defendant's proffered reason was pretext for discrimination.

1. Plaintiff Has Proven That He Possessed Demonstrably Superior Knowledge of ISO 9000 Quality Management Systems and Standards than the Selectee

The first KSAO required a "knowledge of ISO 9000 QMS and standards" and asked for a list of certifications substantiating such knowledge. Defendant admitted in the testimony of its selecting official that Plaintiff satisfied that criteria.

Q: This is the listing for the KSAs, whcih is knowledge of ISO 9000 quality management systems and standards, is that correct?

A: Yes . . .

Q: Do you think that the first paragraph [of Plaintiff's answer] . . . demonstrates a knowledge of ISO 9000 quality management systems?

A: It demonstrates a knowledge.

Q: What about the second paragraph?

A: It demonstrates a knowledge.

Q: What about the third?
A: Okay, it demonstrates a knowledge . . .

Q: Let me make sure that I understand you correctly. KSA 1, which is knowledge of ISO 9000 quality management systems, you say he has [it]. Is that correct?

A: Uh-huh.

Young Dep. pp. 47, 51. Defendant's testimony admits that Plaintiff had the requisite knowledge and skills required for KSA 1. Yet despite the qualifications Defendant admitted Plaintiff possessed, it failed to give Plaintiff any credit or consideration for such knowledge and experience.

The KSA also requested that the applicant list certifications, if any, that demonstrated such knowledge. Plaintiff reported that he held high-level certifications in Quality Management Standards ("QMS"), including an American

25

Society of Quality ("ASQ") Quality Management Certification and ASQ Technician Certification.  However, Defendant admitted that it did not know what the certifications meant or the rigors one would have to pass in order to attain such certifications.

> Q: . . . an ASQ quality manager, do you know how somebody would go about getting that certification?
>
> A: No.
>
> Q: Do you know what the certification means?
>
> A: No.
>
> Q: What about the next one, ASQ certified technician?
>
> A: No, I don't know how to go about getting it and I don't know what it means.

Young Dep. pp. 47-48.  Plainly, Defendant failed to consider the importance of Plaintiff's certifications — which were specifically requested in the KSAs — because Defendant had no intention of affording Plaintiff's application fair consideration.  Defendant had pre-selected the White selectee and was merely reviewing Plaintiff's application pro forma. Burdine, 450 U.S. at 259 (holding that evidence that the employer misjudged the qualifications may be evidence of pretext).

In stark contrast to Plaintiff's ASQ Quality Management Certifation and Quality Technician Certification, the selectee

26

possessed only an ASQ <u>auditor</u> certification.  <u>See</u> Exh. 6.  The selectee held no quality management certifications whatsoever. <u>Id</u>.  Yet, Defendant somehow how the selectee more qualified that Plaintiff for the position of managing and running a largescale QMS system.

Further, the selectee's response indicated that he had knowledge of the FAA ACSEP quality management system, which was recognized as being "equivalent" to the ISO 9001 2000 Standard. <u>See</u> Exh. 6.  In other words, the selectee not only had significantly <u>less</u> knowledge of the ISO 9000 Quality Management System, he stated in his response to KSA that he had <u>no</u> direct knowledge of the ISO 9000 system and this his knowledge was of an "equivalent" system only.  <u>Id</u>.

The fact that two systems are equivalent in terms of complexity or stringency does not mean the systems are identical or even <u>similar</u>.  KSA 1 specifically required knowledge of ISO 9000 — which Defendant admitted Plaintiff possessed and which the selectee admitted he did not.  <u>Patterson</u>, 491 U.S. at 187-88 (1989) (holding that a non-selected applicant may show pretext by demonstrating that the applicant was, in fact, better qualified that the selectee).

2.    <u>Plaintiff Has Proven that He Possessed Superior Skill in Leading and Formulating Policy for an Organization Making a Transition to the ISO 9000 Quality Management System than the Selectee</u>

Plaintiff has demonstrated over fifteen years of experience in the field of quality management systems.  Plaintiff has been employed as an Agency supervisor is the air traffic control division for over thirteen years.  <u>See</u> Exh. 1; Esquibel Dep., p. 17.  Over the course of thirteen years, Plaintiff has conducted hundreds of investigations to ensure strict adherance to quality control standards.  Esquibel Dep., p. 20.  In addition, Plaintiff is one of the first Agency employees to  introduce ISO 9000 and other quality management concepts into the air traffic control division.

> Q: So, as a supervisor air traffic controller, do you get involved in quality management in the aviation industry?
>
> A: On a personal level, absolutely.  There are — there is not a program in the air traffic system that deals with the ISO 9000 or the quality management system as a formal program.  From a personal application, from things that I know and understand through education, I apply those types of initiatives to my daily operation.  I care about customer complaints.  I care about the service that we provide.  I care about the equipment that we use.

Esquibel Dep., p. 28.  Plaintiff was able to introduce such initiatives because of his knowledge and experience in the area of ISO 9000 quality management systems.

In fact, Plaintiff has been called upon to serve as an ISO 9000 subject matter expert.  Exh. 1.  The John Henry Corporation retained Plaintiff to serve as a consultant ISO 9000 expert to implement the company's first ISO 9000 certification initiative. Esquibel Dep., p. 29.

> Q: Have you used [ISO 9000] at any time in your career? . . .
>
> A: I was involved in ISO 9000 with the John Henry Corporation when I was called in as a subject matter expert to implement their initial initiative of ISO 9000 certification.  I was qualified to do so via my education, not the position I held within the FAA.
>
> Q: . . . What about your education made you qualified to do so?
>
> A: Several aspects.  At that particular time, I had amassed about twelve years of education experience in the quality control field . . .

Id.  Plaintiff facilitated the corporation's initiative toward ISO 9000 registration by educating the corporation's managers about the ISO Standard, identifying key areas for improvement and developing and implementing a system for continuous improvement — all of which were necessary for ISO 9000

registration.[2]  Esquibel Dep., pp. 30-33.  Plainly, Plaintiff had ample skill and experience in implementing ISO 9000 systems and, a fortiori, was considered an ISO 9000 subject matter expert.

Moreover, Davenport University hired Plaintiff to teach a course on "the management and control of quality" based on his educational and professional background.  Esquibel Dep., pp. 23-24.

> A: . . . Davenport University . . . hired [me] to teach the quality control class with the background that I brought . . . Management 412, the management and control of quality . . . [a]nd I still teach that class.
>
> Q: . . . What is that class about?
>
> A: That class is about quality management systems from beginning to end.
>
> Q: As it applies to what?
>
> A: Any business organization that wants to implement a quality management program, from the soft skills to the technical skills . . . It is often referred to as the soft skills, but organization behavior, human resource management, those types of things. Motivation.  Leadership.  I often say that that's a misnomer because that's actually the hardest skill to master, are the people skills.
>
> Q: And the technical skills?

---

[2]Ultimately, the John Henry Corporation chose to implement the FDA's regulatory standard, rather than ISO 9000, because the corporation's primary service was the printing of labels for pharmaceutical products.  See Exh. 5 at KSA 2.

A: The technical portion of . . . quality management would be process control, Six Sigma, upper control limits, lower control limits, specifications, reliability, process control, metrology . . . [which] is a body of knowledge that deals with measurement.

Q: Measuring what?

A: Whatever kind of application that a business produces or serves. It could be weights. It could be customer complaints. It could be the tensile strength of metal, the amount of thrust a jet engine produces. Force. Hardness, of titanium, for example . . . [t]here are literally millions of measurements that airline manufacturers have to comply with . . .

Esquibel Dep., pp. 23-25. Davenport University soon recognized Plaintiff's knowledge and skill in training and teaching quality management concepts and requested that Plaintiff teach more courses. Over the past ten years, Plaintiff has taught over 60 courses in the area of production and quality assurance, leadership, business standards and creativity and innovation — all of which are essential components of any quality management system. Esquibel Dep., p. 23.

Plaintiff had spent approximately four to six years implementing and training others to implement an ISO 9000 system for the 4th Air Force.

A: . . . While I was in the Air Force reserve, I was selected competitively to be a member of the leadership development program with the 4th Air Force when they were going to implement a quality system . . . [a]nd that continued for approximately four to six

years, where I would actually go to different Air
Force bases and facilitate leadership development
program[s] . . . to improve their processes . . .

Q: And how does that relate to the ISO 9000 system?

A: It is a core component.  Management is required to
identify the key processes germane to quality . . . I
was instructing and teaching . . . the processes of
quality, and how to implement them.

Esquibel Dep., pp. 29-31.  Plaintiff's four to six years of
experience implementing ISO 9000 systems, coupled with his work
as an ISO 9000 subject matter expert and professor, plainly
afforded him with the requisite skill in implementing ISO 9000
quality management systems.

In stark contrast to Plaintiff's 15 years of ISO 9000
knowledge and experience, the selectee only's experience with
ISO 9000 was when he provided consulting services to two private
organizations that were implementing ISO 9001-2000.  See Exh. 6
at KSA 1.[3]  The selectee's work history fails to mention any
experience with ISO 9000 whatsoever.  See Exh. 6, pp. 1, 3-6,
13-21.  The selectee is not considered an ISO 9000 subject
matter expert, does not teach university courses on ISO 9000
quality management systems and is not certified as a quality

_____

[3]The selectee does not provide the names of the two
organizations he referenced in his answer to KSA 1.

management specialist.  The selectee's only ISO 9000-related training comes from a twenty-four hour course entitled "Introduction to ISO 9000" and a thirty-six hour course in Quality System Auditor Training for ISO 9000.  <u>See</u> Exh. 6, p. 7.

Plainly, Plaintiff possessed demonstrably greater skill, knowledge and experience in ISO 9000 quality management systems than the selectee.  Defendant's selection is a conundrum — a choice even Defendant's selecting official cannot justify.  A reasonable employer would have selected the Plaintiff. Defendant's choice to hire a less-qualified selectee of a different race than Plaintiff, establishes that Defendant's decision was motivated by racial animus.

> If a factfinder could conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate — something that employers do not usually do, unless some other strong consideration, such as discrimination, enters the picture.

<u>Aka</u>, 156 F.3d at 1294.  Defendant's selection of a less-qualified candidate coupled with Defendant's unjustified refusal to provide Plaintiff a debrief, simply smacks of discrimination.

33

3.    <u>Plaintiff Has Proven That He Possessed
Demonstrably Superior Knowledge of Problem-
Solving Techniques for Evaluating Or
Improving Processes and Programs than the
Selectee</u>

Plaintiff's extensive knowledge and experience with ISO 9000 standards requires a significant knowledge of QMS problem-solving techniques.  Plaintiff possessed significant knowledge and experience implementing and utilizing "specific tools in the quality field", including Cause and Effect Diagrams, Precedence Diagrams, Pareto Analyses, Control Charts, Flowcharts, Affinity Diagrams, Force-Field Analyses, Histograms and Scatter Diagrams. <u>See</u> Exh. 5 at KSA 3.

Plaintiff's experience in QMS problem-solving was not limited to established techniques, however.  Plaintiff also developed a new problem-solving technique for the QMS field, which harnessed the individual creativity and innovation of an organization's members to solve organizational problems.  <u>See</u> Exh. 5 at KSA 3.  In fact, Davenport University added an entire class on Plaintiff's technique to its quality management curriculum.  <u>Id</u>.

Moreover, Defendant did not — and could not — dispute Plaintiff's clear knowledge and skill in the area of QMS problem-solving.

34

> Q: . . . [D]o you think that the activities that Mr.
> Esquibel has listed in paragraph one . . . indicates
> knowledge of problem solving?
>
> A: Yes, he has knowledge of problem solving.
>
> Q: Do you think he has knowledge of problem solving
> for improving processes and programs?
>
> A: He has knowledge.

Young Dep., p. 50. Yet, despite Defendant's acknowledgment that Mr. Esquibel possessed knowledge and skill in the area of QMS problem-solving, Defendant chose the selectee instead.

In stark contrast to Mr. Esquibel's knowledge and innovation in the field of QMS problem-solving, the selectee possessed knowledge of only a few problem-solving techniques. The selectee appeared to apply the few problem-solving techniques he was familiar with to most situations.

> The Apollo method or RCA [Root Cause Analysis]
> provides a structured approach to problem-solving
> [sic] by seeking solutions based on both 'Actions and
> Conditions'. This method is applied to all 'event-
> based [sic] problems[,] which are those commonly found
> in work-related [sic] environments.

See Exh. 6 at KSA 3. Notably, the selectee stated that he applied the two techniques to all event-based problems. The selectee failed to address how he would solve problems that were not event-based. The selectee failed to explain whether the two techniques were capable of resolving a variety of event-based

35

problems.  The selectee failed to explain how he would adapt the techniques to different types of problems.  In fact, the selectee failed to demonstrate an in-depth knowledge of problem-solving at all.

Rather, the selectee's answer reveals knowledge limited to two problem-solving techniques that he could apply only to a limited set of problems.  The selectee's answer plainly indicates that if faced with a problem outside the limited set, the selectee lacked knowledge of techniques to solve it.

Plainly, Plaintiff's answer demonstrated a demonstrably stronger understanding and knowledge of various problem-solving measures.  Perhaps most importantly, however, Plaintiff's answer established that he could aid an organization to develop a new solution when establish problem-solving measured had failed, by harnessing the creative energy of the organization's own employees or members.  Plaintiff not only knew a greater number and variety of problem-solving techniques, but also had the unique ability to help an organization develop its own measures. Plaintiff's answer reveals that he possessed demonstrably superior skill and knowledge in the area of problem-solving than the selectee.

4.    <u>Plaintiff Has Proven That He Possessed a
Demonstrably Superior Ability to Communicate
and Provide Guidance to Agency Management
Officials than the Selectee</u>

Defendant does not dispute that Mr. Esquibel's application

package established his ability to communicate clearly and

provide guidance to Agency management officials.

> Q: And if I can direct your attention to number four,
> which is "ability to communicate clearly," would you
> say that what Mr. Esquibel has prepared in answer to
> number four demonstrates an ability to communicate
> clearly?
>
> A: Yes.
>
> Q: Do you think that his answer demonstrates the
> ability to "present authoritative interpretations and
> guidance to management officials"?
>
> A: Yes.

Young Dep., p. 51.  Moreover, Mr. Esquibel's answer to KSA 4

demonstrated that he had, in fact, already represented the FAA

at numerous public gatherings, including a number of safety

seminars and the Operation Raincheck conference.  <u>See</u> Exh. 5 at

KSA 4.

In addition, Mr. Esquibel's approach to communication

demonstrated an innovative and organic approach.  Mr. Esquibel

emphasized that "[e]xcellent leaders are excellent

communicators".  <u>See</u> Exh. 5 at KSA 4.  Mr. Esquibel noted that

37

"people really want to be heard" and, therefore, the best leaders often demonstrated high emotional acuity toward situations. <u>Id</u>. Mr. Esquibel's response to KSA 4 demonstrated a strong committment to the communication process and to establishing dialogues, which would allow more "win-win situations to be developed". <u>Id</u>.

The selectee's response concerning communication skills demonstrated an emphasis on the opposite. The selectee emphasized the presentations and briefings he had given to various audiences. Lightbown KSA 4. Although the selectee's answer demonstrated some level of communication skill, Mr. Esquibel's response demonstrated a deeper understanding of the most effective ways to communicate and the fact that good communication is instrumental to helping an organization achieve positive results.

     5.   <u>Defendant Admitted that Plaintiff Possessed the Requisite Skill in the Use of Microsoft Software</u>

Defendant does not dispute that Mr. Esquibel possessed the requisite skill in the use of Microsoft software. Young Dep.,

p. 51.  Mr. Esquibel's response to KSA 5 demonstrated a facility with Microsoft Word, Excel, Project, PowerPoint and FrontPage.[4]

Based on Mr. Esquibel's demonstrably superior qualifications and Defendant's incongruous and inconsistent statements, Plaintiff has established that Defendant's reason is pretext and that he is entitled to judgment as a matter of law.

**III.  <u>The Court Must Deny Defendant's Motion for Summary Judgment Because Defendant Has Failed to Demonstrate Entitlement to Judgment as a Matter of Law</u>**

Defendant's Motion for Summary Judgment erroneously claims that to prevail, Plaintiff must show that "no reasonable person, in the exercise of impartial judgment, could have chosen [the selectee],' over him".  <u>See</u> Def. Mot., p. 1 (<u>citing</u> <u>Ash v. Tyson Foods</u>, 546 U.S. 454, 457 (2006).  Defendant's reliance on <u>Ash</u> is sorely misplaced.  The Supreme Court's holding in <u>Ash</u> actually establishes that Defendant's quoted standard is <u>not</u> the definitive standard governing pretext claims based on superior qualifications.

> The Court of Appeals, in finding petitioners' evidence insufficient, cited one of its earlier precedents and stated: "Pretext can be established through comparing qualifications    only    when    'the    disparity    in

---

[4]The selectee stated in his answer to KSA 5 that had "used the entire MS Office suite", but not list the specific applications with which he was familiar.

> qualifications is so apparent as virtually to jump off
> the page and slap you in the face.'" . . . The visual
> image of words jumping off the page to slap you
> (presumably a court) in the face is unhelpful and
> imprecise as an elaboration of the standard for
> inferring pretext from superior qualifications.

Ash, 546 U.S. at 456-57. Ash made clear that a plaintiff could

establish pretext without needing to prove superiority such that

"no reasonable person" could have chosen the selectee over him.

Id. Although the Court declined to define the precise standard

that should govern superior qualifications claims, the Court was

clear that the strict standard articulated above was unhelpful.

"It suffices to say here that some formulation other than the

test the Court of Appeals articulated in this case would better

ensure that trial courts reach consistent results". Id. at 458.

The standard articulated by Defendant also fails to cite the

controlling standard in this Circuit.

> A review of the evidence in this case reveals that a
> reasonable factfinder could conclude both that the
> balance of qualifications weighed markedly in Aka's
> favor, and that there was other evidence calling WHC's
> explanation into question.  Viewing the evidence "as
> favorably to [Aka] as reason will permit," as we are
> obligated to do at summary judgment, we find that the
> evidence suffices for a reasonable factfinder to infer
> discrimination.

Aka v. Washington Hospital Center, 156 F.3d 1284, 1295 (1998)

(internal citations omitted).   Here too, the "balance of

qualifications" weighs markedly in Mr. Esquibel's favor. Viewing the evidence in the light most favorable to Mr. Esquibel, a reasonable factfinder could very well find that Defendant intentionally discriminated against Mr. Esquibel. For this reason, Defendant's Motion for Summary Judgment must be denied.

Respectfully submitted,

_____/s/_____

MYRREL C. HENDRICKS, Jr.
JOSEPH D. GEBHARDT
GEBHARDT & ASSOCIATES, LLP
1101 17th Street, N.W.
Suite 807
Washington, DC 20036
Tel: (202) 496-0400
Fax: (202) 496-0404

June 6, 2008          Counsel for Plaintiff

41

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Cross Motion for Summary Judgment was served this 6th day of June, 2008, via facsimile and electronic filing through the Court, upon counsel for Defendant as follows:

> Heather Graham-Oliver
> Assistant United States Attorney
> United States Attorney's Office
> 555 Fourth Street, N.W. — Civil Division
> Washington, DC 20530
> Tel: (202) 305-1334
> Fax: (202) 514-8780

> _____/s/_____
> Myrrel C. Hendricks, Jr.

42